## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION

Your affiant, Homeland Security Investigations (HSI) Special Agent (SA) Devin Taylor, being duly sworn, does depose and state the following:

## PURPOSE OF AFFIDAVIT

1. This affidavit is submitted in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination and extraction of electronically stored information from electronic device associated to Benjamin Gallegos which is currently in law enforcement possession. The electronic device (cellular telephone) to be searched is a black iPhone 8 (**TD**) which is further described in paragraph 8 and Attachment A.

2. There is probable cause to believe that a search of the **TD** will lead to evidence of human smuggling violations under 8 U.S.C. § 1324 as well as to the identification of individuals who are engaged in the commission of those and related crimes.

3. The facts that establish the probable cause necessary for issuance of the Order are personally known to me, are contained in official government or business records I have reviewed; or have been told to me directly by other members of the investigative team, which includes federal, state, or local law enforcement officers with whom I have worked on this investigation.  As this affidavit is submitted for a limited purpose, it does not contain all aspects of this investigation, but only sufficient information to establish probable cause in support of the issuance of an Order for the examination of the **TD**.

## SUSPECTED VIOLATIONS

- Title 8 U.S.C. § 1324(a)(1)(A)(i) (Bringing in alien(s) at an Improper Time or Place)
- Title 8 U.S.C. § 1324(a)(1)(A)(ii) (Transporting an Illegal Alien in Furtherance of the aliens illegal presence in the United States)

- Title 8 U.S.C. § 1324(a)(1)(A)(iii) (Concealing, Harboring, or Shielding Illegal Aliens)
- Title 8 U.S.C. § 1324(a)(1)(A)(v)(I) (Conspiracy to Commit Alien Smuggling)

## TRAINING AND EXPERIENCE

4. I have been employed as a Special Agent with Immigration and Customs Enforcement (ICE) Homeland Security Investigations (HSI) since September 2017. I am currently assigned to the Nogales, Arizona office as a member of the Contraband Smuggling Group. I am a graduate of the HSI Special Agent Training (SAT) Program located at the Federal Law Enforcement Training Center in Glynco, Georgia. While attending HSI-SAT, I received instruction on human smuggling and trafficking crimes under Title 8 and Title 18 of the United States Code, and on the operations of human smuggling organizations (HSOs).

5. I have 14 years of service as a federal law enforcement agent. Prior to working for HSI, I was employed as a Special Agent with the United States Secret Service where I conducted fraud and financial crimes investigations as a member of the Tucson Financial Crimes Task Force. Before becoming a criminal investigator, I worked as a U.S. Border Patrol (BP) Agent in Nogales and Douglas, Arizona. As a BP agent working line-watch, checkpoint, and highway interdiction operations, I experienced firsthand the tactics and techniques used by HSOs to smuggle, transport, and harbor illegal aliens. After receiving a promotion to a BP Intelligence Agent, I conducted detailed analysis of human smuggling events which occurred in the Nogales area and produced intelligence products to assist with investigations and targeting of HSOs exploiting the Nogales area.

6. I possess a Bachelor of Science degree from the University of Arizona in Public Administration and a Master of Science degree from Michigan State University in Intelligence and Analysis. I also possess a graduate level certificate in Homeland Security.

7. During my career in federal law enforcement, and particularly with HSI, I have

participated in or led several human smuggling investigations. The investigations have ranged from incident-based reactive investigations to long term proactive conspiracy investigations involving multiple jurisdictions and countries. During these investigations, I have conducted targeted physical and electronic surveillance of HSO members, been an affiant on Title 3 investigations, debriefed confidential sources reporting on HSOs, oversaw undercover operations, conducted arrests and seizures. I am an "investigative or law enforcement officer of the U.S." within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516. As an HSI agent I retain authority to investigate violations of the Immigration and Nationality Act (INA) codified under Title 8.

### IDENTIFICATION OF THE DEVICES TO BE EXAMINED

8. The electronic target device (**TD**) to be searched is:
   a. A black iPhone 8 64GB cellular telephone, with associated telephone number of +52 669-267-7616;
   b. Model# MQ6K2LL/A, Serial# C6KVJTDMJC6C, IMEI# 356707085210698;
   c. Activated through Telcel and subscribed to an unknown subject;

9. The **TD** was seized from Benjamin GALLEGOS (hereafter GALLEGOS) on Wednesday May 12, 2021 subsequent to his encounter and arrest by HSI agents in Nogales, Arizona. The **TD** is currently secured in the HSI Nogales office located in Rio Rico, Arizona.

10. The applied-for warrant would authorize the forensic examination of the **TD** for the purpose of identifying electronically stored data particularly described in Attachment B.

## STATEMENT OF PROBABLE CAUSE

### I. Background of Investigation

11. HSI Nogales and HSI Attaché Mexico City, in collaboration with the U.S. Attorney's Office in Tucson, Arizona, are jointly investigating a transnational human smuggling network responsible for the illegal entry of thousands of undocumented noncitizen (UNC) migrants into Arizona from Mexico. Smuggled UNCs pay fees ranging from $6,000-$10,000 USD which includes a crossing fee to Sinaloa Cartel affiliates who control the border. The HSO consists of an interconnected transportation network which includes cross-border foot guides, load drivers, and stash house operators. The smuggled UNCs are consolidated in stash houses in Phoenix, AZ where they remain unable to leave, typically in poor conditions, until their smuggling fees are paid in full. Once the smuggling fee is paid, typically by family members, the UNCs are transported to their final destination in the U.S. by the HSO. During the investigation, GALLEGOS was found to be a coordinator for the HSO in Nogales, Sonora, Mexico. GALLEGOS recruited and paid load drivers and coordinated transportation of smuggled UNCs.

### II. GALLEGOS Implicated as a Human Smuggling Coordinator

12. On Tuesday, June 30, 2020, the Nogales Police Department (NPD) conducted a traffic-stop on a silver 2007 Nissan Altima (AZ/TBA2APA). NPD suspected that the vehicle contained UNCs and called U.S. Border Patrol agents to determine alienage. The driver, Alejandro DE LA CRUZ-Caraveo was found to be a UNC from Mexico. The three passengers, identified as Jesus DELGADO-Luna, David MOLINA-Valle, and Armando RAMIREZ-Espinoza, were also found to be UNCs from Mexico and admitted to illegally crossing the international boundary fence earlier that day. None of the subjects had documentation allowing them to be present in the U.S. BP Nogales agents subsequently arrested DE LA CRUZ for involvement in human smuggling.

13. During his post-*Miranda* custodial interview, DE LA CRUZ identified GALLEGOS

as the person he was working for, transporting and harboring smuggled UNCs. DE LA CRUZ stated he had known GALLEGOS for about five years and that they went to school together in Nogales, Arizona. DE LA CRUZ explained to agents the details of the arrangement he had made with GALLEGOS to transport UNCs smuggled into the U.S. DE LA CRUZ stated that "when the phone would ring," DE LA CRUZ would receive instructions from GALLEGOS on where to pick up and drop off smuggled UNCs. From on or about February 26, 2020 to his arrest on June 30, 2020, DE LA CRUZ stated he transported approximately 200 UNCs for GALLEGOS. DE LA CRUZ further stated that he was paid $150 USD per UNC he transported for GALLEGOS and that GALLEGOS received a commission of $50 USD per UNC that DE LA CRUZ transported. DE LA CRUZ believed he netted $2000 a week smuggling UNCs for GALLEGOS. DE LA CRUZ also stated that when he would pick up UNCs, he would video record them as they recited passcodes and would send the videos to GALLEGOS as proof the UNCs were picked up. DE LA CRUZ also described collecting phone numbers associated to cellular phones carried by the UNCs and would message these numbers to GALLEGOS so he could coordinate with them directly. DE LA CRUZ was shown a photo array that included a picture of GALLEGOS and made a positive identification.

### III. Arrest and Interview of GALLEGOS

14. On Wednesday, May 12, 2021, GALLEGOS was apprehended at the Nogales DeConcini Port of Entry (POE) on his outstanding federal felony arrest warrant. Your affiant and other investigators took custody of GALLEGOS and interviewed him at the POE. During his post-*Miranda* custodial interview, GALLEGOS admitted to being involved in human smuggling from 2016 to 2019 but claimed to have stopped since then. GALLEGOS explained to agents that he started as a load driver and had transported smuggled UNCs out of Nogales to Phoenix, Arizona. GALLEGOS stated he delivered UNCs to "Platano" and "Mari," described as HSO leaders in the Phoenix

area. GALLEGOS told agents that in 2017, he transitioned from being a load driver to a human smuggling coordinator. GALLEGOS began working with "Tuercas," the leader of an HSO in Nogales, Sonora, Mexico. GALLEGOS explained to agents his duties as a human smuggling coordinator. In the mornings, GALLEGOS would call a scout on a hill in Mexico to receive information about where groups of smuggled UNCs were located awaiting transportation. GALLEGOS would then coordinate with load drivers and pass the locations and transportation instructions to them via cellular phone. GALLEGOS claimed he made $50 USD profit per UNC he coordinated.

### IV. Facebook Search Warrant Reveals GALLEGOS Continued to be Involved in Human Smuggling Activity in 2020

15. In September 2020, HSI Nogales obtained a federal search warrant (20-03016MB) for Facebook account number 100001107474617, suspected to be used by GALLEGOS. The return of information received from Facebook showed that GALLEGOS used the account to facilitate human smuggling activity. Throughout 2019 and 2020, GALLEGOS used Facebook account number 100001107474617 to recruit load drivers, coordinate logistics and payments, and discuss human smuggling activity. GALLEGOS recruited load drivers by sending Facebook correspondence asking them to pick up and drive "pollos," slang for illegal aliens, and offering to pay $150 per head. In the Facebook communications, GALLEGOS appeared to posture himself as someone with power and rank within a criminal human smuggling organization.

### V. GALLEGOS Provides Phone Numbers to HSI Agents Retrieved From TD

16. Upon completion of his custodial interview, GALLEGOS was escorted to a holding cell by your affiant and another agent. GALLEGOS continued to converse while walking to the holding cell and upon arriving. GALLEGOS stated he could provide telephone numbers for subjects he knew to be involved with human smuggling. Agents retrieved **TD** and handed it to GALLEGOS. GALLEGOS entered the lock screen

passcode opening **TD**. GALLEGOS then scrolled through his contact list and showed agents the following contact names and associated phone numbers, which agents photographed: "Twerkas" +52 631-193-1291, "Twerksw" +52 631-101-2036, "P" +52 631-173-9415, [No Name] +52 631-186-7356, "Platano" 602-601-0235. These telephone numbers all belong to known human smugglers operating in the Nogales, Sonora-area.

### VI. Cellular Telephone Use by Human Smugglers

17. In my training and experience, human smugglers, especially coordinators, frequently utilize cellular telephones to orchestrate the pickup and transportation of UNCs. A human smuggling coordinator such as GALLEGOS remains in contact with foot guides and load drivers to coordinate the pickup of smuggled UNCs crossing over the international border. Cellular telephones are also used to notify the load driver of law enforcement presence in the area and give instructions on how to avoid detection during smuggling attempts. Furthermore, load drivers are often asked to take pictures and record videos of the UNCs they pick up and transport, which are sent to HSO coordinators like GALLEGOS in Mexico as proof the load driver in fact transported the smuggled UNCs to the next destination.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

18. Based on my knowledge, training, and experience, I know that electronic devices such as the **TD** can store information for long periods of time. Similarly, things that have been viewed on the electronic device via the Internet and applications are also typically stored for long periods of time. This information can sometimes be recovered with forensic tools.

19. *Forensic evidence.*   As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described in this affidavit, but also forensic evidence that

7

establishes how the **TD** was used, the purpose of its use, who used it, and when. There is probable cause to believe that the following forensic electronic evidence might be found on the **TD**:

    a)    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b)     Forensic evidence on an electronic device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c)    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d)    The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e)    Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

20. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **TD** consistent with the warrant. The examination may require authorities to employ techniques, including, but not limited to, computer-assisted scans of the entire medium, that might expose many parts of the electronic device to human inspection in order to determine whether it is evidence described by the warrant.

21. *Manner of execution.* Because this warrant seeks only permission to examine the **TD** which is already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## SUMMARY

22. Based on the foregoing factors, I believe that the **TD** was used to facilitate and further the smuggling of undocumented noncitizens through the U.S. in violation of Title 8 U.S.C. § 1324(a)(1)(A)(ii) and other federal statutes. Obtaining the electronically stored information from **TD** is anticipated to yield additional evidence of a human smuggling conspiracy between GALLEGOS and members of the HSO as well as other co-conspirators unknown to investigators

23. Considering the ongoing investigation referred to in this affidavit, and the need to avoid any one of the adverse results enumerated in 18 U.S.C. § 2705(a)(2), it is further requested that this affidavit be filed *under seal* and that notice of the order be delayed for a period of 180 days.

I swear, under penalty of perjury, that the foregoing is true and correct.

DEVIN M TAYLOR
Digitally signed by DEVIN M TAYLOR
Date: 2021.07.15 16:17:34 -07'00'

Devin Taylor
Special Agent
Homeland Security Investigations

9

Subscribed and sworn telephonically before me this __15th__ day of July 2021.

_Leslie A. Bowman_
The Honorable Leslie A. Bowman
United States Magistrate Judge

ATTACHMENT A

PREMISES TO BE SEARCHED

**TD**, which is described as black *iPhone* 8 64GB cellular telephone, with associated telephone number of +52 669-267-7616, Model# MQ6K2LL/A, Serial# C6KVJTDMJC6C, IMEI# 356707085210698; Activated through Telcel and subscribed to an unknown subject. The **TD** is currently being held at the HSI Nogales office and is shown below:




21-03130MB

# ATTACHMENT B
# ITEMS TO BE SEIZED

The particular items to be seized from the device to be searched are as follows:

1. All records on the **TD** that relate to suspected violations of Title 8 U.S.C. § 1324 (Human Smuggling) including:

    a. Any and all communications via third part messaging applications (such as 'WhatsApp,' 'Snapchat,' 'Facebook Messenger,' 'Signal,' 'Telegram,' etc,)

    b. Other installed phone applications that may facilitate the suspected violations, such as money transfer and banking applications

    c. Photographs and videos

    d. SMS/MMS messages

    e. Other messaging application data

    f. Telephone numbers, contact lists, call logs

    g. Appointment books and/or calendars and notes, to-do lists, bookmarks

    h. Electronic mail

    i. Social media accounts, including Facebook, Instagram, and Snapchat, account information

    j. Geo-location data including Google Maps, Bing maps, and WhatsApp Maps

    k. Any and all micro SD, memory cards or hard drives attached to or inside the electronic devices to be searched which are used as extended memory storage devices.

    l. Any other data concealed within the **TD** to be searched that may relate to the suspected violations

    m. Any and all records recording the planning, commission, or execution of the suspected violations

2. Evidence of user attribution showing who used or owned the electronic device to be searched at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents,

and browsing history.

3. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer, smartphone or electronic storage (such as flash memory or other media that can store data) and in any photographic form.